## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

YOLANDA PARKER,

      Plaintiff,

v.                                        CASE NO: 8:06-cv-183-T-26EAJ

NANCY POTTER and
DOOLEY & DRAKE, P.A.,

      Defendants.

_____/

## O R D E R

Before the Court are cross-motions for summary judgment: (1) Nancy Potter's Motion for Summary Judgment on Counts I, II, and III of the Third Amended Complaint (Dkt. 99), Potter's Statement of Undisputed Facts (Dkt. 103), the affidavit of Nancy Potter (Dkt. 102), the depositions of William Dooley and Nancy Potter (Dkts. 100 & 101), Plaintiff's Response in Opposition (Dkt. 120); and (2) Plaintiff's Motion for Summary Judgment on Count I (Dkt. 116), Plaintiff's Statement of Undisputed Facts (Dkt. 117), the deposition of Yolanda Parker (Dkt. 119), and Potter's Response in Opposition.  (Dkt. 123).  After careful consideration of the motions, the Court concludes that Plaintiff Parker's motion should be granted and Defendant Potter's motion should be denied as to count I and granted as to counts II and III.

**Pertinent Facts**

On May 22, 2002, "Gary K. Parker, a single man" purchased property in Bayside Subdivision in Clearwater, Florida, by warranty deed.[1]  One year later, on May 20, 2003, Gary Parker refinanced his home on Bayside Drive in Clearwater, Florida.[2]  Mr. Parker signed a balloon note secured by the mortgage on the Bayside residence, and received a loan in the amount of $875,000 from Money Consultants, Inc.[3]  This sum covered the extent of the first mortgage, which was $741,941.14 payable to Washington Mutual.[4]  At the closing of the refinancing, a "Corrected" Assignment of Mortgage and note was executed by "Gary K. Parker, a Single Man" to Money Consultants, Inc.[5] and assigned to Nancy Potter.[6]  Mr. Parker received the TILA[7] disclosures at the closing.[8]

---

[1]  See docket 99, Exh. B — Warranty Deed.

[2]  See docket  99, Exh. A— Balloon Mortgage Note.

[3]  See docket 99, Exh. A—Balloon Mortgage Note.

[4]  See docket 116 at Answer to Request for Admissions No. 10.

[5]  According to William Dooley, the attorney present at the closing, Money Consultants is an entity that searches for private lenders to loan money. (Dkt. 100, Depo. of Dooley, p. 31).  He characterized the entity as a "straw."  Black's Law Dictionary defines "straw man" as "a third party used in some transactions as a temporary transferee to allow the principal parties to accomplish something that is otherwise impermissible." (8th ed. 2004).

[6]  See docket 99, Exh. G — Assignment of Mortgage.

[7]  Truth-in-Lending Act.

[8]  See docket 99, Exh. I — Disclosure Statement and Rescission Notice.

As further evidence that Gary Parker was a single man at the time of the closing, he submitted a loan application in which he checked the box indicating that he was unmarried.[9]   To the contrary, however, Mr. Parker was a married man at the time of the refinancing.  He was married to Yolanda Parker on December 11, 2002.[10]   Yolanda and Gary Parker lived together at the Bayside property until some time in 2004 when they separated.[11]   On July 7, 2004, Gary Parker quit claimed the property to "Gary K. Parker and Yolanda Parker, husband and wife."[12]

About three months after the closing, Defendants became aware of the fact that Gary Parker was married to Yolanda Parker, and had been married to Yolanda Parker at the time of the refinancing.[13]   Mr. Dooley's office called Mrs. Parker to come in and sign the mortgage.[14]   She complied and signed the mortgage on August 19, 2003.[15]   At the time she signed the mortgage, title to the property was held solely in Gary Parker's

---

[9]   See docket 99, Exh. J — Uniform Residential Loan Application.

[10]   See docket 119— Depo. of Yolanda Parker, p. 8.

[11]   See docket 119, p. 11.

[12]   See docket 99, Exh. C.  The grantor on the quit claim deed was "Gary K. Parker, a married man, joined by his wife, Yolanda Parker."

[13]   See docket 100, p. 12.

[14]   See docket 100, pp. 11-12.

[15]   See docket. 99, Exh. F — First Mortgage.

name.[16]  The mortgage was corrected to read "Gary K. Parker and Yolanda Parker,

husband and wife" and re-recorded with her signature on it.[17]

Yolanda Parker is not an obligor on the note, and she was told she was not

obligated on the note.[18]  At the time the mortgage was executed by Yolanda Parker, the

loan was not in default.[19]  On August 19th, however, the property at issue was the

principal residence of Yolanda Parker and Gary Parker.[20]  Yolanda Parker was not given

any TILA disclosures or notice of the right to rescind as required by 15 U.S.C. § 1635.

Ms. Potter avers that she funded the May 20th loan "from the loan's inception."

She avers that she received all three payments made by Gary Parker.[21]  Ms. Potter swears

that the May 20th loan is the first time she ever extended consumer credit through a loan.[22]

 William Dooley, the attorney at the closing, testified that this was the first loan Ms.

Potter had made, and as such, she would not have been required to give the TILA

disclosures.[23]

---

[16]  See docket 99, Exhs. B & C.

[17]  See docket 99, Exh. F.

[18]  See docket 99, Exh. A.

[19]  See docket 101, Depo. of Potter, pp. 24-25.

[20]  See docket 64, paras. 2, 17, & 41.

[21]  See docket 102.

[22]  See docket 102.

[23]  See docket 100, Depo. of Dooley, pp. 30-31.

## Count I

Count I of the Third Amended Complaint seeks rescission of the transaction pursuant to the TILA.  The right of rescission arises under 15 U.S.C. § 1635, and Yolanda Parker exercised those rights against Ms. Potter as an assignee under 15 U.S.C. § 1641(c). Mrs. Parker argues that the loan at issue qualifies as a "consumer credit transaction" under the TILA, 15 U.S.C. § 1602, because the money obtained was used to pay off an existing mortgage.[24]  Mrs. Parker contends that she is a "consumer" pursuant to Regulation Z by virtue of the security interest Money Consultants, Inc. acquired in the Parkers' principal dwelling.  Rather than provide her with the TILA disclosures and notice of rescission rights, Dooley & Drake, P.A. told her that her legal rights would not be affected by signing the mortgage.  Mrs. Parker calculates the afforded late rescission window as expiring three years from August 19, 2003, the date she signed the mortgage. Thus, she claims that her rescission notice sent by her former attorney was timely given on September 29, 2005.[25]  (Dkt. 116, Exh. D).  In any event, this action was filed on

---

[24]   See docket 116, Comp. Exh. A, Req. for Admiss. #10—"At closing of the refinance, Dooley directed $741,941.14 to Washington Mutual to pay off the existing mortgage on the Property" "Dooley admits the allegations in Request #10."

[25]   A mortgage foreclosure action was instituted in state court in January 2004 and summary judgment was entered in January 2005, in which the state court judge permitted foreclosure.  Exactly what course of events transpired after the initial sale date was stayed is unclear from this record.

5

February 1, 2006, which is within the three years after Yolanda Parker executed the

mortgage on the Bayside property.[26]

*Is the Refinancing a Consumer Credit Transaction?*

Under the TILA, a consumer has standing to seek rescission of a "consumer credit

transaction" under 15 U.S.C. §§ 1635 and 1641(c).  A "consumer credit transaction"

includes transactions "in which the party to whom credit is offered or extended is a

natural person, and the money, property, or services which are the subject of the

transaction are primarily for personal, family, or household purposes."  15 U.S.C. §

1602(h); 12 C.F.R. § 226.2(12) (stating that consumer credit is extended "primarily for

personal, family, or household purposes").   Apart from the disclosure requirements under

the TILA, the right of rescission inures to consumers whose principal dwelling is retained

as a security interest.  15 U.S.C. § 1635 (including in consumer credit transactions those

in which a security interest is acquired in any property used as the principal dwelling of

the person to whom credit is extended).  In this case, the money obtained was secured by

the Parkers' principal dwelling and was used to pay off the existing mortgage on the

principal dwelling in the amount of $741,941.14, leaving the remainder of the

$875,000.00 loan for Mr. Parker's personal use.   Based on the purpose of the loan at

issue and the encumbrance of the Parkers' principal dwelling, the refinancing of the

---

[26]   Ms. Potter does not refute that the notice was timely.

6

Bayside property constitutes a consumer credit transaction under the TILA.

*Is Ms. Potter a Creditor?*

A "creditor" is defined in pertinent part as a person who both "(1) regularly extends . . . consumer credit . . . , and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness."[27]  15 U.S.C. § 1602(f); 12 C.F.R. § 226.2(17)(I) (requiring same).  The official commentary to Regulation Z presents a "strict position" on who may be a creditor.  In re Jones, No. 06-81987-JAC-13, 2007 WL 1725593, at *11 (Bankr. N.D. Ala. Jun. 13, 2007).  The official commentary to paragraph 2(a)(17) provides as follows:

> If an obligation is initially payable to one person, that person is the creditor even if the obligation by its terms is simultaneously assigned to another person.

12 C.F.R. Pt. 226, Supp. I , Subpt. A. Cmt. 2(a)(17)(i)(2).[28]  These opinions of the Federal Reserve Board staff should be granted deference unless "demonstrably irrational."  Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); Household Credit Serv., Inc. v. Pfennig, 541 U.S. 232, 238, 124 S.Ct. 1741, 1746, 158 L.Ed.2d 450 (2004) (noting Congress' designation of Federal Reserve Board as

---

[27]  There can be only one creditor in any given consumer credit transaction.

[28]  At least in the case of automobile loans in which the bank and the dealer have a relationship, the fact that the sales contract shows the initial obligation payable to the dealer dictates that the dealer is the creditor even if it provides for immediate assignment to the bank.  12 C.F.R. Pt. 226, Supp. I, Subpt. A. Cmt. 2(a)(17)(i)(2); Ellis v. General Motor Acceptance Corp., 160 F.3d 703, 705-08 (11th Cir. 1998) (holding that GMAC was assignee even though contract was simultaneously assigned by dealer).

7

primary source for construction of TILA).  Courts should not substitute their

interpretations of the TILA absent a finding that the Board's interpretation is irrational.

See Clement v. Amscot Corp., 176 F.Supp.2d 1292, 1295 (M.D. Fla. 2001) (citing Ford

Motor and Anderson Bros. Ford v. Valencia, 452 U.S. 205, 219, 101 S.Ct. 2266, 68

L.Ed.2d 783 (1981)).

      As the Eleventh Circuit previously held in this case in its opinion on the dismissal

of the complaint,[29] Ms. Potter is not a "creditor" as that term in defined under the TILA

because she was not the person to whom the debt was initially payable.  The debt was

initially payable to Money Consultants, Inc., not Ms. Potter.  As noted by the Eleventh

Circuit, Ms. Potter is not referenced on the note, nor is she named on the mortgage.

Although Mr. Dooley testified in deposition that Money Consultants, Inc. was a "straw,"

that the money loaned was Ms. Potter's, and that the documents signed at the time of the

transaction should be read together to effectuate a loan directly from Ms. Potter to Mr.

Parker, essentially bypassing Money Consultants, Inc., these facts in the record do not

alter the conclusion that Ms. Potter was not a creditor for purposes of this transaction.

*Is Ms. Potter an Assignee?*

      Having established that Ms. Potter is not a creditor for purposes of this transaction,

the Court must next consider whether Ms. Potter is an assignee and as such liable to Mrs.

Parker for rescission.  The TILA distinguishes between creditors and assignees in cases

---

[29]   Parker v. Potter, 232 Fed.Appx. 861, 865 (11th Cir. 2007).

seeking recovery of damages.  For the failure to make appropriate disclosures, an assignee will not be held liable in damages unless the TILA violation is apparent from the face of the disclosure statement.  See 15 U.S.C. §§ 1640(a) and 1641(a); Parker v. Potter, 232 Fed. Appx. 861, 865 (11th Cir. 2007).  To rescind a transaction as against either a creditor or an assignee, however, the TILA disclosure violation need not be apparent from the face of the disclosure statement.  See15 U.S.C. § 1641(c); Parker, 232 Fed. Appx. at 865 (citing Rowland v. Novus Fin. Corp., 949 F.Supp. 1447, 1448 (D. Haw. 1996)).  Thus, the consumer may seek rescission against an assignee "regardless of whether the assignee had notice of disclosure violations." Parker, 232 Fed.Appx. at 865.  By the unambiguous terms of the instruments, Ms. Potter took an assignment of the loan on the Parkers' primary dwelling.

*Is Mrs. Parker's Homestead Interest Subject to the Security Interest?*

The right to rescind a transaction encumbering one's principal dwelling exists if his or her "ownership interest is subject to the security interest."  12 C.F.R. 226.2(11); 12 C.F.R. 226.15(a)(1)(i) (applying rescission rights to a security interest retained in "a consumer's principal dwelling" for "each consumer whose ownership interest is subject to the security interest").  The term "ownership interest" is referenced only in the regulations and is not defined.  The regulations further provide that any words not otherwise defined in the regulation "have the meanings given to them by state law or contract."  12 C.F.R. § 226.2(b)(3).

9

Mrs. Parker did not hold title to the Bayside residence at the time she signed the mortgage.  Mr. Parker took fee simple title as a single man to the Bayside property before he married Yolanda Parker.  Both lived there as husband and wife at the time he refinanced in May 2003 and in August 2003 when she signed the mortgage.[30] Although Mrs. Parker did not hold title to her primary residence, by virtue of her marriage to Mr. Parker, she enjoyed homestead status.[31]  The homestead property of a married couple may not be subjected to forced sale unless the owner, if only one is named on the deed, is joined by the other spouse on the mortgage.

Ms. Potter's reliance on Bills v. BNC Mortgage, Inc., No. 06 C 3283, 2006 WL 3227887 (N.D. Ill. Nov. 3, 2006), in support of her contention that homestead rights do not rise to the level of an "ownership interest" under the TILA, is misplaced.  Interpreting Illinois law, the district court noted that "a non-titled spouse living on the property has no homestead rights, and thus no possessory rights."  Id. at *2.  The Bills court answered the hypothetical that if the non-titled spouse did enjoy homestead rights, then such interest

---

[30]   Mr. Parker did not quit claim title to himself and Yolanda Parker as husband and wife until July 2004.

[31]   In Florida, there are three different types of constitutional homestead.  Coy v. Mango Bay Property and Invest., Inc., 963 So.2d 873, 876-877 (Fla.Dist.Ct.App. 2007). The type of homestead applicable in this case is the right to prohibit a forced sale of the marital home.  Fla. Const. art. X, § 4(a)(1).

still would not rise to the level of an "ownership interest" under the TILA. <u>Id.</u> at *3. Because of the history and nature of Florida homestead law, <u>Bills</u> is not persuasive.[32]

For over 125 years, Florida has recognized by its constitution that homestead is akin to a "sacred cow" and may not be alienated contrary to the rights of those who enjoy its protection.  <u>See</u> <u>In re Gatto</u>, 380 B.R. 88, 92 n. 4 (Bankr. M.D. 2007); <u>Chames v. DeMayo</u>, 972 So.2d 850, 862 (Fla. 2007); <u>Bigelow v. Dunphe</u>, 143 Fla. 603, 197 So. 328 (Fla. 1940); <u>Daniels v. Katz</u>, 237 So.2d 58, 60 (Fla.Dist.Ct.App. 1970).  Under Florida property law, possession of homestead property by a spouse constitutes a cloud on title. <u>Daniels</u>, 237 So. 2d at 60.  One need not hold fee simple title in the property to take advantage of homestead, but a possessory interest is sufficient.  <u>See</u> <u>Southern Walls, Inc. v. Stilwell Corp.</u>, 810 So.2d 566, 569 (Fla.Dist.Ct.App. 2002).  "[T]he concept of homestead will be given different meanings depending on the context in which it is used." <u>Southern Walls</u>, 810 So.2d at 568-69.  The purpose of Florida homestead is "to promote the stability and welfare of the state by securing to the householder a home, so that the homeowner and his or her heirs may live beyond the reach of financial misfortune and the demands of creditors who have given credit under such law."  <u>Snyder v. Davis</u>, 699 So.2d 999, 1002 (Fla. 1997).  Florida's homestead is "not susceptible to comparisons with similar provisions in other jurisdictions." <u>Snyder</u>, 699 So.2d at 1002.

---

[32]   Ms. Potter also cites <u>Weitzner v. United States</u>, 309 F.2d 45 (5th Cir. 1961). <u>Weitzner</u> interprets Florida homestead in relation to federal tax liens, and it is "well-settled that state exemption laws do not protect property against federal tax liens." <u>Wietzner</u>, 309 F.2d at 47.

Having traced the importance of homestead in Florida, the exact descriptors of homestead vary greatly among the various situations in which homestead is discussed in case law.  While the Florida Constitution employs the word "owned" to describe homestead, "owned" is not defined and "does not limit the estate that must be owned, i.e., fee simple, life estate or some lesser interest."  Southern Walls, 810 So.2d at 569.  Thus, giving deference to the meaning that state law gives to homestead, ownership of homestead under Florida law can be equated with some "lesser interest."  What is clear under Florida law is that one asserting homestead need not hold legal title to the property in order to prohibit its forced sale.  See Callava v. Feinberg, 864 So.2d 429, 431 (Fla.Dist.Ct.App. 2003) (holding that mere beneficial interest in property is sufficient to assert homestead rights); Heiman v. Capital Bank, 438 So.2d 932, 933 (Fla.Dist.Ct.App. 1983) (holding that record title is not prerequisite to finding homestead status and beneficial interest of husband in home titled in wife's name was sufficient).

Mrs. Parker relies on two federal cases which hold that homestead rights constitute a security interest in the principal dwelling under the TILA.  See Hamilton v. Southern Discount Co., 656 F.2d 150 (5th Cir. 1981); Elzea v. National Bank of Georgia, 570 F.2d 1248 (5th Cir. 1978).  Interpreting Georgia law, these cases essentially hold, under the TILA in force at the time, that the waiver and assignment of homestead exemption is a

security interest subject to disclosure under the TILA.  These cases, however, do not address the situation before this Court.[33]

There is no question that before Mrs. Parker signed the mortgage, she had the right to prevent the forced sale to creditors of her primary dwelling, even though her name was not on the title to the residence.  See In re Gatto, 380 B.R. at 92 n.4 (citing Taylor v. Maness, 941 So.2d 559, 564 (Fla.Dist.Ct.App. 2006); Pitts v. Pastore, 561 So.2d 297, 300 (Fla.Dist.Ct.App. 1990); Jameson v. Jameson, 387 So.2d 351, 353 (Fla. 1980)). Following the regulation's directive to consider state law's meaning given to words not otherwise defined in the regulation, this Court concludes that Mrs. Parker's homestead rights in the Bayside property constituted an "ownership interest" for purposes of the TILA and as such, she is entitled to rescind the transaction based on the failure of Ms. Potter to provide her with the requisite TILA disclosures and notice of the right to rescind.

## Counts II and III

Based on the record before this Court, there is no evidence of the fraud raised in counts II and III and therefore this Court grants summary judgment in favor of Ms. Potter on these two counts.

---

[33]   Mrs. Parker also relies on In re Jones, 298 B.R. 451 (Bankr. D. Kan. 2003).  In that case, the court held that the TILA requires that each spouse be given the requisite copies of TILA disclosures when securing a loan on their home.  The case does not mention how title to the property was held; it only recognizes that the husband alone applied for the loan.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)     Plaintiff's Motion for Summary Judgment on Count I (Dkt. 116) is

        **GRANTED**.

(2)     Defendant Potter's Motion for Summary Judgment on Counts I, II, and III

        of the Third Amended Complaint (Dkt. 99) is **DENIED** as to count I, and

        **GRANTED** as to counts II and III.

(3)     The clerk is directed to enter judgment in favor of Plaintiff and against

        Defendant on count I for rescission, and in favor of Defendant and against

        Plaintiff on counts II and III for state law claims of fraud.

(4)     The clerk is directed to close this case.

**DONE AND ORDERED** at Tampa, Florida, on October 8, 2008.


            s/*Richard A. Lazzara*
        **RICHARD A. LAZZARA**
        **UNITED STATES DISTRICT JUDGE**


COPIES FURNISHED TO:
Counsel of Record

14